**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DAVID W. CORBITT and** ) | |
| **ALEXANDER J RAYA, JR.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO. 06-0860-CG-M** |
| ) | |
| **HOME DEPOT USA, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendant, Home Depot USA, Inc.,

("Home Depot") for summary judgment (Doc. 86), plaintiffs' response thereto (Doc. 92), and

defendant's reply (Doc. 118). The court finds that the alleged wrongful conduct was not

sufficiently severe or pervasive to establish a hostile environment claim. The court further finds

that even if the conduct alleged was sufficiently severe and pervasive, that Home Depot has

successfully established the Faragher defense. The court also finds that plaintiffs have not

establish a prima facie case of retaliation or shown that Home Depot's proffered legitimate

reason for terminating plaintiffs is pretextual. The court also finds that Home Depot is not liable

for the intentional torts of assault and battery, outrage, and invasion of privacy because it did not

have proper notice or actual knowledge of the alleged conduct. The court further finds that the

alleged wrongful conduct does not rise to the level of outrage or invasion of privacy. Thus, the

court finds that summary judgment is due to be **GRANTED** in favor of defendant as to

plaintiffs' claims of **hostile environment, retaliation, assault and battery, outrage and**

**invasion of privacy**. However, the court finds that defendant has not met its burden with regard

to plaintiffs' claim of negligent supervision and training and, therefore, that summary judgment is due to be **DENIED** as to plaintiffs' **negligent supervision and training** claim.


## FACTS

This action arises from plaintiffs' employment with and termination from Home Depot in 2005. The plaintiffs assert claims of sexual harassment and retaliation in violation of Title VII against Home Depot. Specifically, plaintiffs claim that Home Depot's Human Resource Manager, Lenny Cavaluzzi, sexually harassed them and subjected them to a hostile work environment from March 2005 until mid-November 2005 and that they were terminated on December 13, 2005, in retaliation for reporting the alleged sexual harassment. Plaintiffs also assert state law claims of invasion of privacy, assault and battery, outrage and negligent supervision and/or retention against Home Depot. Home Depot denies plaintiffs' sexual harassment claims and asserts that even if the alleged conduct occurred, the allegations do not rise to the level of sexual harassment under Title VII and do not constitute intentional torts of assault and battery, invasions of privacy, or outrage under Alabama law. According to Home Depot, plaintiffs were lawfully terminated for egregious and repeated violations of Home Depot's markdown policy.


**A. Alleged Harassment of Corbitt**

Plaintiff, David Corbitt, began working with Home Depot in August 1990 as a sales associate. (Corbitt Depo. P. 10). He was promoted to management in 1996 or 1997 and became a Store Manager of the Ft. Walton Beach store in 2001. (Corbitt Depo. p. 11). Corbitt was

transferred to the Mobile, Alabama, store on Montlimar Road in May 2002 and then to the Foley, Alabama, store in September 2003. (Corbitt Depo. pp. 11-14). Corbitt was transferred back to the Mobile store in February or March 2005, after an hourly associate accused him of sexual harassment. (Corbitt Depo. pp. 13-14).

Corbitt testified that he saw Cavaluzzi "maybe eight times" during the entire period of alleged harassment. (Corbitt Depo. pp. 83-84). Corbitt alleges that Lenny Cavaluzzi began sexually harassing him around the third week of March 2005. (Corbitt Interog. 14). Cavaluzzi called Corbitt into his office at the Foley Home Depot store and, over his speaker phone, invited Corbitt to come to his hotel the following week. (Corbitt Interog. 14). Two other Home Depot employees were in Corbitt's office during the speaker phone call and looked at Corbitt like he had been having these conversations with Cavaluzzi all the time. (Id.).

Around the fourth week of March, while at the Home Depot Round Table Meeting in Pensacola, Cavaluzzi greeted Corbitt with a "hug and grub" in front of Leon McLaughlin and Donna Calhoun and other managers, such as Rick Liska, Sabrina Jones, and Dan Shulte. (Calhoun Depo. pp. 66-68, 92-97). Donna Calhoun is the store Human Resource Manager at the Mobile store and Leon McLaughlin was the District Manager of the Florida Panhandle at that time. (Calhoun Depo. pp. 14-16, Corbitt Depo. p. 14). Cavaluzzi allegedly gave Corbitt a full body hug and rubbed his head, neck, and shoulders. (Corbitt Depo. pp. 62-63). Cavaluzzi asked Corbitt how he was doing, and Corbitt answered that he was cold. Cavaluzzi then said "maybe we should cuddle later." (Corbitt Depo. p. 63). Calhoun thought Cavaluzzi's conduct was inappropriate and noticed that Corbitt was uncomfortable. (Calhoun Depo. p. 95). Corbitt never told Cavaluzzi that this behavior made him uncomfortable. (Corbitt Depo. p. 63). Later that

same night, Cavaluzzi called Corbitt at home and instructed Corbitt to bring the assistant manager file to him at the Pensacola store. (Corbitt Interog. 14). Cavaluzzi walked out to the parking lot as Corbitt drove up and reached into Corbitt's car and tried to rub his neck and shoulders. (Corbitt Interog. 14). Cavaluzzi told Corbitt that he had a room at the Hampton Inn and asked Corbitt to come join him for a couple of drinks. (Id.). Corbitt told Cavaluzzi he could not go for a drink because he had company at his house and rolled up his window. (Corbitt Depo. pp. 70-71, Corbitt Interog. 14).

From the first week of April 2005 through the third week of November 2005, Cavaluzzi called Corbitt at the Mobile store two to three times a week and made comments like "I was not his usual type, but he could not stop thinking about me," "I know you're not gay, but you've probably thought about it, I could show you how, I know you'll like it," "he liked my baby face," "he liked how small I was," "I was cute," "did I wear boxers or briefs or nothing," "I like your dark tan," "did I color my hair," when I said "no," he said then "that's your natural color down there too," "did I shave my full body," he said "it looks like I shaved my arms," "How is my wife," "how long have I been married," "aren't you bored with being with the same woman," he told me to visit two gay websites that were his favorites, " I should look at them so I could see what he is talking about," "did my wife and I swing," and "he liked the way that I dressed." (Corbitt Interog. 14, Corbitt Depot pp. 75-87). The calls began as regular business calls but changed to social calls and lasted less than a minute each. (Corbitt pp. 77-80). The calls offended and embarrassed Corbitt. (Corbitt Depo pp. 81, 101).

In the first week of August 2005, Cavaluzzi sneaked up behind Corbitt in the training room at the Mobile store, put his hand on Corbitt's shoulder and rubbed Corbitt's belly. (Corbitt

4

Interog. 14, Corbitt Depo pp. 92-94).  Corbitt immediately pulled away. (Id.).  Cavaluzzi snuck

up behind Corbitt again on November 18, 2005, in the training room at the Pensacola store and

started rubbing Corbitt's neck and shoulders. (Corbitt Interog. 14, Corbitt Depo. pp. 106-111).

Corbitt had said that he was cold, and Cavaluzzi asked Corbitt if they needed to go out and

"cuddle." (Id.).

**B. Harassment of Alex Raya**

Raya began working for Home Depot on November 1, 1993, as a sales associate. (Raya

Depo. p. 6).  He was promoted to Department Supervisor around June 1994 and Assistant Store

Manager in 1997 or 1998. (Raya Depo. pp. 7-8).  Raya was promoted to Store Manager at the

Daphne, Alabama, store in November or December 1999 and on April 21, 2005, transferred to

open the new Pensacola store as Store Manager. (Raya Depo. pp. 7-8).

Raya alleges Cavaluzzi began sexually harassing him around the third week of March

2005. (Raya Depo. pp. 214-219, Raya Interog. 14).  Cavaluzzi came into the Daphne store

training room, sat down next to Raya and put one arm on Raya's shoulder "like he was my best

friend in the world" and one arm on Raya's leg under the table.(Raya Depo. pp. 205-206, 214-

219, Raya Interog. 14 ).  According to Raya, Cavaluzzi's arm on his shoulder made him feel a

little uncomfortable but he was able to "shrug it off," but that once Cavaluzzi put his hand on his

leg, he scooted his chair away and severed contact. (Raya Depo. pp. 216-218).  Raya felt

uncomfortable but did not feel that this initial incident was severe. (Raya Depo. p 328).

On April 28, 2005, Cavaluzzi sneaked up behind Raya in front of several store managers

in the lobby of the Hampton Inn in Pensacola and started running his fingers through Raya's hair

and massaging his head. (Raya Interog. 14, Raya Depo. pp. 237-240).  Cavaluzzi said Raya had

beautiful hair and that he could run his fingers through Raya's hair all day. (Raya Interog. 14,

Raya Depo. pp. 238-239).  Raya leaned forward and asked Cavaluzzi "what are you doing."

(Raya Interog. 14).  Cavaluzzi answered "I love your hair and I could run my fingers though

your hair for hours." (Raya Interog. 14).  The other managers laughed during the incident, they

were making fun of Raya. (Liska Depo. pp. 24, 28).

      Beginning in the last three weeks of March 2005 and continuing through the second week

of November 2005, Cavaluzzi called Raya at the Daphne store two to three times per week

saying things like "what I was wearing," "are you wearing those pants that I like," "that I always

dressed nice," "that I was cute," "I am going to be in town, what are you working next week,"

"when are you getting off work," "was I happily married," "how long had I been happily

married," "my hair was beautiful," "I like your green eyes," "I like the rough look," "would I

meet him for drinks," "you're the Italian heifer that I like," and "I like your temper." (Raya

Interog. 14, Raya Depo. pp. 219-235).  These comments were made during business calls that

lasted a couple of minutes and the comments were often coupled together.  (Raya Depo. pp. 223-

236).  For instance, Cavaluzzi might call to let Raya know when Cavaluzzi would be in town and

ask Raya's schedule and when he would be getting off work. (Raya Depo. p. 226).  Cavaluzzi's

visit in town was for a business reason. (Raya Depo. p. 236).  Cavaluzzi never suggested what he

wanted to do outside of work because Raya "never let it really get that far." (Raya Depo. p. 226).

Cavaluzzi never asked him for a kiss or any other sexual activity and never made comments

about his rear end or other parts of his sexual anatomy. (Raya Depo. pp 276, 278).

      On June 15, 2005, at the contractor's night grand opening for the Pensacola store,

Cavaluzzi gave Raya a full body hug and started massaging Raya's back in front of Raya's wife and family and other managers', including the Florida Panhandle District Manager, Leon McLaughlin. (Raya Interog. 14, Raya Depo. pp. 241-252).

On August 26, 2005, Cavaluzzi snuck up behind Raya at a meeting at the Lake Forrest Country Club and began rubbing his shoulders and neck and said Raya was in good shape, muscular and trim, and asked whether he worked out and commented that Raya always dressed so nice and his pants fit so nicely. (Raya Interog. 14, Raya Depo. pp. 264-266).

Cavaluzzi also allegedly intimately massaged Raya at a managers meeting at the Homewood Suites in Pensacola. (Calhoun Depo. pp. 88-92).

**C. Home Depot's Harassment Policy**

The Home Depot Harassment and Non-discrimination policy established the following procedure for reporting harassment:

> If an associate believes he or she is the victim of discrimination or is being harassed or exposed to conduct that is offensive then the associate should tell the person to stop the conduct immediately and contact a member of management. Does not feel comfortable discussing the problem with a particular manager, contact the Store Manager, District Manager, Store Human Resource Manager, Division Human Resources Manager, Employment Practices Manager, or HR Vice President.  Wants to report harassment or discrimination but wants to remain anonymous. Call the Aware Line at 1-800-286-4909 to report harassment and discrimination.

(Plaintiffs' Ex. 5).

The plaintiffs admit that they were aware of Home Depot's policy prohibiting sexual harassment. (Raya Depo. pp. 115-121, 253; Corbitt Depo. pp. 232-234).

**D. Reports of Harassment to Home Depot**

Home Depot management was allegedly aware of some of the alleged sexual harassment incidents because management personnel witnessed some of the incidents, as detailed above. Store managers Dan Shulte, Chris Mangino, and Rick Liska gave Raya the nick name "Lenny's Bitch" and called him that behind his back. (Liska Depo. pp. 45-47).

The Human Resource Manager, Donna Calhoun, was aware of other inappropriate conduct in which Cavaluzzi engaged, such as taking her and other subordinates to his hotel room to show them a stripper pole in his room. (Calhoun Depo. pp. 77-78). On April 25, 2005, an anonymous employee called the Home Depot Awareness Line to report that Cavaluzzi was using inappropriate "physical gestures" and making "inappropriate comments to females in the workplace." (Cavaluzzi, Plaintiffs' Exs. 12, 36).

Raya asserts that he first complained to Calhoun about Cavaluzzi in April 2005. (Raya Depo. p. 327). Raya feared that he would lose his job for reporting Cavaluzzi. (Raya Depo. p. 331). Raya also alleges that he complained to Rich Edgeworth, the Human Resource Manager for the Daphne store, after Edgeworth witnessed Cavaluzzi sneak up behind him and massage him on August 26, 2005, at the Lake Forest Country Club. (Raya Depo. p. 264-267). Raya told Edgeworth that something had to be done. (Id.). The complaint and interrogatory responses state that Raya reported the alleged harassment to Donna Calhoun in November 2005. (Complaint, ¶ 25, Raya Interrog. 14). Raya testified that Cavaluzzi's inappropriate behavior ended once he reported it to Calhoun in November 2005. (Raya Depo. p. 260). Raya never told Cavaluzzi that his actions made him uncomfortable and he never reported the alleged harassment to any person at the level of or above Cavaluzzi. (Raya Depo. pp. 272, 289). Raya made an Awareness Line

complaint four days after his termination, on December 17, 2005, but did not allege sexual harassment or that he was terminated because he complained of sexual harassment. (Raya Depo. pp. 115-121).  Raya's Awareness Line complaint asserted that he was wrongfully terminated and complained about  Dardas and McLaughlin, and not about Cavaluzzi. (Raya Depo. pp. 115-121).

Corbitt testified that he told Donna Calhoun, the store Human Resource Manager, "as a friend," about being harassed by Cavaluzzi in the early part of the summer of 2005. (Corbitt Depo. p. 96).  However, Corbitt testified that he did not want Calhoun to take any action on his complaints at that time. (Corbitt Depo. p. 97).  According to Calhoun, she had a "casual conversation" with Cavaluzzi about his behavior in June 2005 but that neither Corbitt or Raya had made an official complaint to her at that time. (Calhoun Depo. pp. 98-101).  Calhoun states that plaintiffs' said something like "this has got to stop" or that it "makes me feel uncomfortable, next time you see the opportunity could you tell him to knock it off." (Calhoun Depo. pp. 101-102).

Corbitt alleges that he told Calhoun on November 18, 2005, that she had to make Cavaluzzi stop what he was doing even if that would result in Corbitt losing his job. (Corbitt Depo. p. 111).  Calhoun testified that she reported Cavaluzzi's sexual harassment of Corbitt and Raya to Leon McLaughlin and to the Alert Line. (Calhoun Depo. pp. 167-168).

Corbitt made an Awareness Line complaint on December 15, 2005, two days after his termination. (Corbitt Depo. pp. 232-234, Defendant's Ex. 11).  Corbitt's Awareness Line complaint focused on Corbitt's belief that his District Manager, McLaughlin, retaliated against him because "He and I just didn't hit if off." (Corbitt Depo. p. 239, Defendant's Ex. 11). Corbitt's Awareness Line complaint mentioned one incident of alleged harassment by Cavaluzzi,

when Cavaluzzi rubbed his neck and shoulder and asked him if he needed to cuddle after Corbitt said he was cold. (Corbitt Depo. pp. 241-242, Defendant's Ex. 11).

The Complaint alleges that "[t]he sexual phone calls, the head rubs, the neck rubs, the shoulder rubs, the belly rubs, and the sexual comments by Cavaluzzi all stopped after the Plaintiffs complained to Home Depot." (Complaint, § 27).

**E. Investigation and Discipline of Cavaluzzi**

Home Depot did not discipline Cavaluzzi as a result of any complaints by plaintiffs and Cavaluzzi's personnel file does not indicate that Cavaluzzi was investigated until several months after plaintiffs were terminated. (Home Depot Interog. 4, Plaintiffs' Ex. 33).

F. **Investigation and Termination of Plaintiffs**

In August or September 2005, Cavaluzzi directed Susan Parker, the Store Resource Manager, to tell Raya that Cavaluzzi "had a hard on for him." (Parker Depo. p. 13).  Parker understood Cavaluzzi to mean that he had it in for Raya. (Parker Depo. p. 14).

Donna Calhoun testified that in November 2005, Leon McLaughlin was walking the store more frequently and asking hourly associates about Corbitt. (Calhoun Depo. pp. 62-63).   Leon McLaughlin also allegedly diverted credit for FEMA sales arranged by Corbitt at the Mobile Store to the Daphne Store. (Corbitt Depo. pp. 278-279).  Corbitt and Raya were terminated on December 13, 2005, for violating Home Depot's mark down policy and for using a company cell phone for their own private use. (Plaintiff's Attachments 3, 4).

According to Home Depot, it has a written policy for allowing discounts to customers

that states that when a customer shows that a competitor has a lower price, Home Depot will beat a competitor's price on identical in-stock merchandise by 10% and meet a competitor's price on all special order merchandise, installations, or other special order products. (Hall Declaration). This "meet and beat" policy did not apply to commodity items such as lumber, because the costs fluctuate constantly. (Hall Declaration).  In the past, Home Depot had issued 10% "Friends and Family" coupons on a quarterly basis.  The "Friends and Family" coupons are good for a one-time discount with certain exclusions.  Home Depot stores in the South Alabama/Florida Panhandle District also hold 10% contractor breakfasts on a quarterly basis.  The contractor breakfasts allow contractors-customers to receive a 10% discount on all purchases one morning each fiscal quarter with certain exclusions. (Hall Declaration).

Home Depot conducted an investigation of the markdown practices used by its managers. The parties dispute when the investigation began.  According to Home Depot, its District Loss Prevention Manager, Michael Hall, began an investigation into the markdown practices in Home Depot's South Alabama/Florida Panhandle District in late April or early May 2005. (Hall Depo. pp. 153-154).  The store investigation reportedly began after Hall witnessed a contractor-customer at the Foley store request a 10% discount and stated that Corbitt had given him the discounts when Corbitt was manager at that store. (Hall Depo. p. 136, Hall Declaration ¶ 10). However, plaintiffs point out that the earliest dated document in the first version of Hall's investigation file is dated September 28, 2005. (Doc. 92, p. 18)  Liska testified that he was not aware of any investigation until McLaughlin questioned him, sometime after Hurricane Katrina - after August 29, 2005. (Liska Depo. pp. 8-10).

Hall and his supervisor, the Regional Loss Prevention Manager, Andy Stofanik

11

investigated whether contractor-customers received blanket discounts at any stores in the district and whether any such discounts were approved by the District Manager. (Hall Depo. p. 137, Hall Declaration ¶ 11).  Cavaluzzi did not initiate or take part in the investigation and Hall reportedly had no knowledge of plaintiffs' sexual harassment complaints. (Cavaluzzi Depo. pp. 32-33, Hall Depo. p. 41, Hall Declaration ¶¶ 14, 16).  Several managers were found to have violated the mark down policy; however, Home Depot asserts that the investigation showed that Corbitt and Raya had the most egregious violations.  Raya approved discounts to several contractors, competitors, and Home Depot employees, falsified company records, approved a mark down for his wife, had knowledge of a fraudulent return of merchandise for an employee, and used a company cell phone for personal use. (Attachment to Hall Depo. HD-0715-0716,  Hall Declaration).   Raya's violations reportedly included discounts to Midway Lumber, a direct competitor of Home Depot, located just a few miles from the Daphne Home Depot store managed by Raya. (Attachment to Hall Depo. HD-0715, Raya Depo. pp. 52-53).  Midway Lumber received in excess of an estimated $70,000 in discounts to purchases. (Attachment to Hall Depo. HD-0715).   As part of the investigation, Hall and Stofanik questioned District Manager Erik Dardas who reported that he had instructed store managers that they should never give discounts to competitors or wholesalers. (Attachment to Hall Depo. HD-0743).  Dardas also reported that he never issued a blanket directive authorizing 10% discounts to contractor-customers and stated that store managers needed approval of any truckload sales especially when the company was dealing with supply and demand issues or hurricane related product demands. (Id.).  Raya testified that he told Dardas about most of the sales to Midway but admitted that he never told his current District Manager, McLaughlin, about any of the sales. (Raya Depo. pp.

12

103-106).  McLaughlin took over the South Alabama/Florida Panhandle District in November

2004 and Raya reportedly continued to sell truckloads of discounted lumber to Midway until he

left the store in April 2005. (McLaughlin Declaration ¶ 5).

     Hall determined that Corbitt approved unauthorized discounts to contractors and Home

Depot employees, used a company cell phone for personal use, and falsified product returns.

Corbitt reportedly admitted in a written statement during the investigation that he allowed a 10%

discount to all contractor-customers who spent $500 or more using a Home Depot charge card.

(Attachment to Hall Depo. HD 805-808).  Corbitt admitted that 160 contractors had received a

discount during the 7 month period following Hurricane Ivan. (Id.).  According to Corbitt, the

practice of giving contractors blanket discounts also existed at the Daphne store when he took

over as Store Manager there and it had been implemented by former Store Manager, Sandy

Snyder, with the approval of then District Manager, Eric Dardas. (Attachment to Hall Depo. HD

771-772).  The Store Manager before Corbitt at the Fort Walton store, Rick Mongeau, reported

during the investigation that there was no practice of giving blanket discounts to contractors

when he turned the store over to Corbitt. (Attachment to Hall Depo. HD 782).  The manager that

took over the Fort Walton store after Corbitt, Polo Cutts, stated that there were at least 75

contractors receiving a blanket 10% discount when he took over and that he discontinued the

practice. (Attachment to Hall Depo. HD781).  Sandy Snyder, who was the Store Manager

immediately before Corbitt at the Foley store, stated that there was only one contractor that was

allowed a blanket 10% discount when he turned the store over to Cobitt. (Attachment to Hall

Depo. HD 809).  Donna Montgomery, the Store Manager at the Foley store immediately

following Corbitt, stated that there was a list of contractors that received a blanket 10% discount

on all purchases approved by Corbitt and that she discontinued the practice. (Attachment to Hall Depo. HD 787). Hall determined that Corbitt approved discounts to several associates and marked down merchandise to generate a $450 gift card to pay a vendor for a promotion he was running at the store, falsified refunds to pay unauthorized installers to install merchandise for customers, marked down major appliances to $0.00 to pay a radio talk show host doing a show at the store, approved a 35% discount to an associate, and approved a 10% discount to certain associates during Hurricane Ivan. (Attachment to Hall Depo. HD 716-717).

Regional Human Resources Director, Lisa Keglovitz, and Regional Vice President, Mark Powers, determined, after reviewing Hall's investigation report, that Corbitt and Raya's actions constituted violations and warranted termination. (Keglovitz Depo. p. 34, Powers Declaration ¶ 4). According to Keglovitz and Powers, they were not aware of Corbitt and Raya's complaints at the time they decided to terminate them. (Keglovitz Declaration ¶ 8, Powers Declaration ¶ 8). Because Corbitt and Raya were Store Managers with over 10 years service, their termination required review by the Director of Employment Practices, Tim Taylor, and Human Resources Vice President, Ashley Goldsmith. (Taylor Declaration ¶ 3, Goldsmith Declaration ¶3). Taylor and Goldsmith reviewed the recommendations and determined that termination was proper. (Taylor Declaration ¶ 4, Goldsmith Declaration ¶ 4). Taylor and Goldsmith also report that they were not aware of plaintiffs' harassment complaints at the time they decided Corbitt and Raya should be terminated. (Taylor Declaration ¶ 7, Goldsmith Declaration ¶ 7). According to Cavaluzzi, decisions to terminate are group decisions, that every person in the group has a little bit of input into the decision, "But they don't really – they don't put it on us to make the decision, That's their decision." (Cavaluzzi Depo. p. 13). Cavaluzzi did not make the decision to

14

fire Corbitt and Raya (Cavaluzzi Depo. p. 32, Keglovitz Declaration ¶¶ 6-7, Powers Declaration ¶¶ 6-7, Taylor Declaration ¶¶ 5-6, Goldsmith Declaration ¶¶ 5-6).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle

Glade, 178 F.3d 1175, 1187 (11th Cir.1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).


## B. Harassment and Hostile Work Environment (Count One)

Plaintiffs claim they were the victims of sexual harassment and hostile work environment. There are two ways in which sexual harassment can be actionable under Title VII:

> One way is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her. That conclusion logically has to follow, because tangible employment action is defined in a way that includes a change in the terms and conditions of employment. See Burlington

> Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998).  As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761, 118 S.Ct. at 2268; see also, Johnson, 234 F.3d at 512.
>
> * * * *
>
> The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. See [Burlington Indus., Inc., 524 U.S.] at 754, 118 S.Ct. at 2265.

Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004) (footnote omitted).  To establish a prima facie case of sexual harassment in violation of Title VII, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that there is a basis for holding the employer liable. Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1199 (11th Cir. 2001).

Bryant v. School Bd. of Miami Dade County, 142 Fed.Appx. 382, 383, 2005 WL 1669596, *1 (11th Cir. July 19, 2005). The above elements apply to both hostile work environment and "tangible employment action" claims.  Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245 n 3 (11th Cir. 2004) (citations omitted).   Plaintiffs do not appear to allege and have not supported a claim that a tangible action was taken against them because they refused to submit to a supervisor's sexual demands.  Cavaluzzi allegedly engaged in improper conduct, but there has been no evidence or argument that he made sexual demands.  Instead, plaintiffs' claims in Count One appear to fall under the second scenario described above, hostile environment.

The court finds it questionable whether plaintiffs have shown that the harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment.  "For an atmosphere of sexual harassment or hostility to be actionable, ... the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004) (citations and internal quotations omitted).  The

17

requirement that the harassment be severe or pervasive contains an objective and subjective component. <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1276 (11th Cir. 2002). "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." <u>Id.</u> (internal quotations omitted).  To establish the subjective component, the employee must "subjectively perceive" the harassing behavior as being sufficiently severe or pervasive to alter the terms or conditions of his employment. <u>Mendoza v. Borden</u>, 195 F.3d 1238, 1246 (11th Cir. 1999).

        In the instant case, Raya testified that at least some of the incidents were not severe by themselves, and there is no evidence that either plaintiff was unable to adequately perform their job as a result of the alleged harassment or that the harassment materially affected their job performance in any way.  However, there is evidence that Cavaluzzi's alleged conduct embarrassed the plaintiffs and made them uncomfortable, and the court finds that looking at the evidence in the light most favorable to plaintiffs that there is sufficient evidence for a reasonable jury to find that plaintiffs subjectively perceived their environment at Home Depot to be abusive. <u>See</u> <u>Smith v. Northwest [Norwest] Fin. Acceptance, Inc.</u>, 129 F.3d 1408, 1413 (10th Cir. 1997) (fact that plaintiff was "humiliated" and "upset" by her supervisor's hostile remarks was adequate evidence to satisfy subjective component).

        To establish the objective component, the hostile work environment is "judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances." <u>Mendoza</u>, 195 F.3d at 1246.  The factors to consider in making this determination include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22-23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  "[E]mployees are entitled to a work environment that allows them to function effectively and to do the work they were hired to perform to the best of their ability

without having to run a gauntlet of sexual abuse or face other forms of discrimination." <u>Coates v. Sundor Brands, Inc.</u>, 164 F.3d 1361, 1366 (11th Cir. 1999) (citation and internal quotations omitted). "Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a sexual or gender-related nature ... before they are considered in determining whether the severe or pervasive requirement is met." <u>Gupta v. Florida Board of Regents</u>, 212 F.3d 571, 583 (11th Cir. 2000) (citations omitted). "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted." <u>Id.</u> "Title VII, "is not a 'general civility code.'" <u>Id.</u> (citing <u>Fragher v. City of Boca Raton</u>, 524 U.S.775 at 788 (U.S. 1998), 118 S.Ct. 2275 at 2283-84). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Faragher</u>, 524 U.S. at 788, 118 S.Ct. at 2283 (citations and internal quotations omitted).

The fact that plaintiffs are the same sex as the person who allegedly harassed them does not eliminate the possibility that plaintiffs suffered a sexually hostile environment. The Supreme Court has recognized that same sex sexual harassment is actionable, and that the focus of any sexual harassment analysis should be on whether members of one sex are exposed to disadvantageous terms or conditions of employment "because of sex." <u>Oncale v. Sundowner Offshore Services</u>, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 1002,140 L.Ed.2d 201 (1998). In order to support a same sex harassment claim, the employee must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but that it actually constituted "discrimination because of sex." <u>Id.</u> at 80-81, 118 S.Ct. at 1002. According to the Supreme Court, Title VII does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same and of the opposite sex. <u>Id.</u> at 81, 118 S.Ct. at 1003. The statute's prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the

conditions of the employment. Id.

In Mendoza, the court held that the following conduct, which spanned nearly eleven months, was not sufficiently severe or pervasive to alter the plaintiff's terms or conditions of employment: one statement by a supervisor that he was "getting fired up"; one incident when the supervisor rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; two occasions where the supervisor made "sniffing" sounds while looking at the plaintiff's groin; one incident where he made a similar sniffing sound, but did not look at her groin; and testimony that the supervisor followed the plaintiff and stared at her (unaccompanied, though, by any evidence that the following and staring amounted to "stalking," "leering," intimidation or threats). Mendoza, 195 F.3d at 1242, 1247, 1249.[1]

In contrast, in Jackson v. Cintas Corp., 391 F.Supp.2d 1075 (M.D.Ala. 2005), the Middle

---

[1] For examples of other cases which have found that the conduct was not sufficiently severe or pervasive to create a hostile environment see Smith v. America Online, Inc., 499 F.Supp.2d 1251, 1261 (M.D. Fla. 2007) (actions were not sufficiently severe or pervasive where the plaintiff alleged harassing conduct spanned approximately one month and consisted of: "(1) Britton's comment to either Smith or Raychael Harkey at the movies 'Damn, you clean up good;' (2) Britton's comment that he would 'like to eat those oranges off [Smith's] body;' (3) Britton's action of pulling Smith close to him by her belt loops at the copy machine; (4) Britton's attempt to hug and kiss Smith in the Ruby Tuesday parking lot; and (5) Britton's comment to Smith 'I like your new position.'"), which cited the following cases: Hockman v. Westward Comms., LLC, 407 F.3d 317, 328-29 (5th Cir. 2004) (actions of a co-worker toward plaintiff over a year and a half period were not sufficiently severe or pervasive to satisfy the objective standard: (1) commenting to plaintiff about a co-worker's behind and body; (2) once slapping plaintiff on the behind with a newspaper; (3) brushing up against plaintiff's breasts and behind while passing her; (4) one incident of holding her cheeks and trying to kiss her; (5) asking plaintiff to come to the office early so that they could be alone; and (6) one incident of standing in the doorway to the bathroom while plaintiff was washing her hands); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (summary judgment affirmed for employer where supervisor told plaintiff she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand"), and Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (plaintiff's claims that supervisor repeatedly told plaintiff how beautiful she was, asked her out on dates, then when rebuffed told plaintiff she was a "dumb blonde" when she made mistakes counting inventory, tried to kiss her at a bar as well as two other times, placed "I love you" signs in plaintiff's work area and touched her shoulder at least six times, were insufficient to establish actionable sexual harassment).

District of Alabama found that the following conduct was sufficiently severe and pervasive for a

jury to find there was a hostile environment:

> The severity of Angell's conduct is illustrated by its overtly sexual nature. Almost
> immediately upon Jackson's hire, Angell made clear his management style when,
> as Jackson's direct supervisor, Angell told her that "going down" on him would
> "get[ ][her] high places" at Cintas. In addition to pronouncing that oral sex would
> result in company advancement, in the days to follow, he told Jackson that she
> sexually aroused him and illustrated his comment by grabbing his genitals. He
> also "invited" Jackson to have sex with him in the conference room.
> > ****
> The severity in this case is magnified by Angell's physical contact with Jackson.
> Twice, Angell touched Jackson's breast. While Cintas remarks that the contact
> lasted only a "millisecond" or "second" it is the hasty and trite manner--with a
> "smirk" and a cheeky comment (i.e., "Ooh I touched a tit")--which inferentially
> bolsters a finding that Angell held a belief that his managerial power bestowed
> upon him the right to sexually engage his subordinates whenever he desired.

Ibid at 1088-1089 (citations to the court record omitted).[2]

---

[2] Other examples of cases which found the conduct was sufficiently severe and pervasive
include: Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1247-1249 (employee of fast food
restaurant presented enough evidence for a jury to conclude that the following conduct of her
male supervisor over a two to three week period was objectively severe or pervasive: (1)
multiple direct and indirect proposals for sex; (2) repeated attempts to touch her breasts, place
his hands down her pants or pull off her pants; (3) following her into the bathroom; and (4)
enlisting help from others while he attempted to grope her), Johnson v. Booker T. Washington
Broadcasting Serv., Inc., 234 F.3d 501, 506-07, 509 (11th Cir. 2000) (radio co-host who also
served as plaintiff's supervisor engaged in conduct that was sufficiently severe or pervasive to
fall within objective sexual harassment when in a four month period he, among other things,
repeatedly told plaintiff she had a sexy voice, called out plaintiff's name and pulled his pants up
in an obscene manner so plaintiff could see the imprint of his private parts, repeatedly attempted
to massage plaintiff's shoulders against her wishes, stuck his tongue out in an obscene manner,
rubbed his "body parts" against plaintiff and commented about sex to plaintiff and asked her
about her sex life), Dees v. Johnson Controls World Serv., Inc., 168 F.3d 417, 418, 422 n. 12
(11th Cir. 1999) (actions of Fire Chief and Assistant Chief and two other supervisory personnel
toward plaintiff on a daily basis over about a three year period including sexually explicit jokes,
comments about her body, requests to sit on their laps-and on one occasion when plaintiff
refused, the Assistant Chief picking her up and squeezing her so hard she urinated in her pants,
one occasion where one of the supervisors ground his groin into plaintiff's buttocks while stating
"look at that sexy mama, I could just eat you in that skirt," multiple propositions for sex and
repeated incidents of grabbing and slapping plaintiff's buttocks and leg, were sufficiently severe
or pervasive), Splunge v. Shoney's, Inc., 97 F.3d 488, 489 (11th Cir. 1996) (pervasive hostile
environment existed where four managers of restaurant "grabbed Plaintiffs, commented
extensively on their physical attributes, showed them pornographic photos and videotapes,

In the instant case, the court finds that the severity and pervasiveness of the incidents fall somewhere between the <u>Mondoza</u> and the <u>Jackson</u> case. The most analogous case the court can find in this Circuit with regard to the type and pervasiveness of the alleged harassing conduct is <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571 (11th Cir. 2000). In <u>Gupta</u>, as in this case, the plaintiff complained of harassing phone calls as well as comments concerning the plaintiff's looks and a few touchings, including her superior having put his hand on the plaintiff's thigh. The conduct complained of took place over a six to seven month period. The <u>Gupta</u> plaintiff described the calls and some of the other harassing conduct as follows:

> [H]e used to call me at home.... Quite frequently--two times, three times, you know, a week on an average.... He would call me either late at night, because often 9:30, 10:00 o'clock at night, or over the weekends.... He said, "Are you talking to your boyfriend? Where is your boyfriend?"
>
> His phone calls continued until January of 1995. In one of the calls, Rhodd asked Gupta, "I was wondering how you were doing?" During some of these evening phone calls, Rhodd asked if she was in bed. He also called her one Sunday morning and informed her that he was going to be the new Associate Dean of the College of Liberal Arts. He told her that "as an economist now, [she had] to take up more responsibilities."
>
> Rhodd also frequently asked Gupta to have lunch with him. At first, Gupta had lunch with Rhodd almost every day, but later she began having lunch with other colleagues. Gupta thought that Rhodd was upset when she went to lunch with other people. Rhodd started telling Gupta, "Well, you know, I know with whom you went to lunch with," and "You don't go to lunch with me any more." He commented that some of the faculty members that Gupta had lunch with were "racist" and "evil." Once when she was wearing a skirt that was above her knee, she perceived that Rhodd "was staring at [her] legs." It made her "uncomfortable" and since that time she has "never worn a short skirt."
>
> Once when Gupta was in Rhodd's office discussing her teaching schedule, as she described it, he "just rolled his chair and came close to me and he put his

---

offered them money for sex, favored other employees who had affairs with them, [and] speculated as to the plaintiffs' sexual prowess ..."), and <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 601-03, 608 (2d Cir. 2006) (reversing district court's grant of summary judgment and holding a reasonable jury could conclude that vice president of company's actions toward employee over a five month period of repeatedly telling her that if she wanted a raise she was "sleeping with the wrong employee," at an office party in the presence of other employees placing his hand on employee's upper thigh and taking a picture of himself doing it, asking if the employee would go with him to his hotel room after the party, and, on several occasions, approaching plaintiff from the back while she was working and placing his hands on her back, neck and shoulders, was objectively severe or pervasive).

hand on my right thigh." His hand was partly on the inside of her thigh. It happened very quickly, and Gupta moved away very quickly. On another occasion, Rhodd touched her bracelet and said, "Oh, it is a very nice bracelet." Another time, he touched a ring Gupta was wearing.

On another occasion when Gupta went into Rhodd's office, "he suddenly rolled his chair towards [her] and he said, 'What kind of material is that?' and he lifted the hem of [her] dress" about four inches with his hand. She instinctively stepped back. Another day, when the air conditioning was broken and it was very hot, Rhodd was expecting Gupta to come pick up a book from his office. Gupta entered Rhodd's office and discovered that he had on his undershirt, but had taken his dress shirt off. She offered to come back to see him later, but he said to wait and at the same time "he unbuckled his belt and pulled down his zipper and start[ed] tucking his [dress] shirt in." She thanked him for the book and left. Rhodd also made some comments to Gupta that she characterized as harassment. He told her that the reason she was assigned to teach more hours than other teachers and the reason she had not received her new computer was that "people here are racist." Once Dr. Rhodd commented, "You are looking very beautiful." Twice he told her, "Indian people are really decent, and the Caribbean and Western people are really promiscuous. I can look at you and I can tell you are innocent and you don't have much experience." One morning after a bad thunderstorm the night before, Rhodd called Gupta and asked if she needed a ride to a University seminar. During that conversation, he said, "Oh, you were all by yourself on a dark and stormy night? Why didn't you call me? I would have come and spend [sic] the night with you." Gupta understood Dr. Rhodd's suggestion to mean "that he wanted to [have a] sexual relationship with me." She told him, "Don't talk to me that way. You are talking nonsense."

On one occasion, Rhodd stated that he considered men superior to women, that women are like meat, and that "men need variety in women." Once, Rhodd came into Gupta's office and asked her "Why do you look so unhappy? Have you fallen for a man you can't talk about?" She responded, "What are you talking about?" He replied, "I give you six months to fall for a man about which you won't be able to talk about." Gupta thought that Rhodd was referring to himself.

Gupta, at p. 578-579 (footnote omitted). The Eleventh Circuit found that such conduct was not sufficiently severe or pervasive to establish a hostile environment claim. The Court found that the comments complimenting the plaintiff's looks would not be offensive to a reasonable person. Id. at 585. The Court explained as follows:

It is debatable whether such a compliment is sexual in nature, but assuming that it is, we do not believe that a reasonable person would deem it to be offensive. A man can compliment a woman's looks (or a woman compliment a man's looks) on one or several occasions, by telling her that she is looking "very beautiful," or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment. See Oncale, 523 U.S. at 81, 118 S.Ct. at 1003 (explaining that intersexual flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory

"conditions of employment").

Id.  The Court found that the most serious conduct complained of was the placing of the

supervisor's hand on the plaintiff's knee and his touching the hem of her dress. Id.  The Court

stated that "[h]e should not have done either of those things." Id.   However, the Court found that

those incidents were not sufficient to create a hostile environment, reasoning as follows:

> But those were only two incidents in a period of six or seven months during
> which they were interacting (out of an even longer period during which the two
> worked for the University). Each incident was only momentary, and neither was
> coupled with any verbal suggestions or advances. See Minor [v. Ivy Tech State
> College, 174 F.3d [855] at 857 [(7th Cir. 1999)]  (no hostile environment where
> the supervisor, among other things, on one occasion "put his arms around [the
> plaintiff], kissed her, squeezed her, and said, 'Now, is this sexual harassment?' ").

Id.

The court finds the instant case to be analogous to the Gupta case.[3]  Comments like "I

_____

[3] Home Depot cites another case which it alleges is similar in severity and pervasiveness
to the conduct alleged in the instant case, Mitchell v. Pope, 189 Fed.Appx. 911, 2006 WL
1976011 (11th Cir. 2006).  Though it is an unreported case, the court agrees that the conduct
alleged in the case is also similar to the instant case in severity and pervasiveness.  In Mitchell,
the Eleventh Circuit stated the following:

> Plaintiff points to 16 specific instances of offensive conduct by Overbey. Of these
> instances, most involved "offensive utterances." Only three times did Overbey
> touch her or attempt to touch her: when he tried to kiss her, when he lifted her
> over his head, and when he rubbed up against her and reached across her chest.
> And Plaintiff did not assert that she felt threatened by Overbey's conduct. In
> addition, much of Overbey's conduct involved horseplay; and some was not
> sex-based. Although Overbey's reprehensible behavior only can be described as
> crass and juvenile, we accept that this behavior-given its relative infrequency-is
> not the kind of "severe" harassment necessary for liability to attach under Title
> VII. Overbey's conduct is more comparable to the conduct in Gupta v. Florida Bd.
> of Regents, 212 F.3d 571, 584-86 (11th Cir. 2000), and in Mendoza, 195 F.3d at
> 1247, which we concluded was not objectively severe or pervasive.

Mitchell, 89 Fed.Appx. at  913-914, 2006 WL 1976011,**2 (footnotes omitted).
Home Depot also cites an unreported case decided by this court. Davis v. Baroco
Electrical Construction Co., Case No. 99-1055-S, 2000 WL 33156436 (S.D. Ala. Dec.15, 2000).
In Davis, this court found that two or three sexual remarks a day and four incidents of physical
conduct over a 10 day period, by a male supervisor towards a male employee, fell short of
actionable hostile environment. Davis, 2000 WL 33156436, at *6-7.  The plaintiff in Davis
alleged that his supervisor sexually harassed him by asking plaintiff "do you want to feel my

like your baby face," "you are cute," and "I like the way you dress" are complimentary words that may have been flirtatious but do not constitute sexual harassment. The most serious conduct may have been Cavaluzzi putting his hand on Raya's thigh, but, as in <u>Gupta</u>, the incident was only momentary and was not coupled with explicit sexual suggestions or advances. In fact, plaintiff admitted that this incident by itself was not severe. Raya testified that Cavaluzzi never suggested what he wanted to do outside of work, Cavaluzzi never asked him for a kiss or any other sexual activity and never made comments about his rear end or other parts of his sexual anatomy. Additionally, there is no evidence that the conduct affected plaintiffs' job performance. The court finds that looking at the facts in the light most favorable to plaintiffs, that the conduct is not sufficiently severe or pervasive to create a hostile environment.

Even if the conduct alleged was sufficiently severe and pervasive, Home Depot has asserted an affirmative defense. The Supreme Court has established an affirmative defense for an employer for an actionable hostile work environment created by a supervisor, which may be raised if no tangible employment action has been taken. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). An employer may avoid vicarious liability for a hostile work environment created by a supervisor by demonstrating "(a) that the employer

---

pipe?"; asking plaintiff "Did you stretch your ass out for me?" when plaintiff returned from the bathroom; telling the plaintiff "you're a young strapping man with a nice ass"; touching plaintiff's side and knee in a suggestive manner on four occasions; asking plaintiff "can I play with your hole?"; telling plaintiff "hey, handsome, come here and sit in my lap; making comments to plaintiff about having a "fine ass" or "cute ass"; making comments to plaintiff about "drinking his cum, raping him, and straddling his face"; blowing plaintiff kisses; telling plaintiff he wanted to lick his rear"; telling plaintiff "come sit on my lap"; telling plaintiff when he complained that "there was nothing he could do about it"; talking about the plaintiff's genitals; telling plaintiff he was making him "horny"; telling plaintiff "I'm sweaty between my legs"; and asking plaintiff "can I drill you with my pipe. <u>Id.</u> at *5-6. The court dismissed the claim because there was no evidence that the plaintiff was physically threatened or afraid or that the conduct interfered with or impaired plaintiff's job performance. <u>Id.</u> at *20. In the instant case there is also no evidence that plaintiffs were physically threatened or afraid or that the conduct interfered with or impaired plaintiffs' job performance. The alleged touchings were not physically threatening or sexually overt and the harassing comments are far less graphic than the alleged comments in <u>Davis</u>.

exercised reasonable care to prevent and correct promptly any [ ] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807.  "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted).  Further, the first element of the affirmative defense has two prongs: (1) reasonable care to prevent sexual harassment and (2) reasonable care to correct sexual harassment. Id. at 1314.

    To be deemed sufficiently preventive, an anti-harassment policy must be "comprehensive, well-known to employees, vigorously enforced, and provide[ ] alternate avenues of redress." Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997). The evidence in this case demonstrates that the plaintiffs were well aware of the anti-harassment policy and that Home Depot enforced the policy in their stores.  Additionally, the procedures did not require that a particular chain of command be maintained in reporting any harassment and offered several avenues for complaints to be lodged.  The court finds that the anti-harassment policy was sufficiently preventative.  See Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1299 (11th Cir. 2000) (finding that the employer's sexual harassment policy met "the minimal requirements for the Faragher affirmative defense" where  "the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives.").

    To be appropriate, "[t]he 'remedial action' must be reasonably likely to prevent the misconduct from recurring." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996).  Although there is some evidence that Cavaluzzi was not officially investigated until after plaintiffs were terminated, the plaintiffs admit that the harassing conduct stopped after the plaintiffs complained to Home Depot.  Since the alleged misconduct did not reoccur, the court

26

finds that Home Depot took sufficient action to correct the harassment once the plaintiff complained.  Thus, Home Depot has established the first prong of the <u>Faragher</u> defense.

The court finds that Home Depot has also established the second prong of the <u>Faragher</u> defense.  Plaintiffs did not tell Cavaluzzi to stop as prescribed in the anti-harassment policy. Additionally, the hostile environment of which plaintiffs complain occurred before the plaintiffs lodged complaints.  Although they spoke to Donna Calhoun and others about the alleged harassing conduct, they told them only "as friends" and did not want to lodge an official complaint.  As such, Home Depot was not placed on proper notice of the harassment and the plaintiffs did not take full advantage of Home Depot's preventative measures. <u>See</u> <u>Nurse "Be" v. Columbia Palms Hospital</u>, 490 F.3d 1302, 1310 (11th Cir. 2007) (finding the employer was not placed on proper notice and that plaintiff had not taken full advantage of the employer's preventative measures where she insisted her complaint remain confidential and not be reported (citations omitted)).

## C. Retaliation (Count Two)

Plaintiffs claim that Home Depot retaliated against them for reporting sexual harassment. A  plaintiff may prove discrimination or retaliation by relying on either direct, circumstantial, or statistical evidence.  <u>See</u> <u>Walker v. NationsBank of Florida N.A.</u>, 53 F.3d 1548, 1555 (11th Cir. 1995) <u>see</u> <u>also</u> <u>Wright v. Southland Corp.</u>, 187 F.3d 1287, 1305 (11th Cir. 1999) ("the same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the <u>McDonnell Douglas</u> presumption." citation omitted). Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" <u>Hamilton v. Montgomery County Bd. of Educ.</u>, 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting <u>Carter v. Three Springs Residential Treatment</u>, 132 F.3d 635, 641 (11th Cir. 1998)).  As the District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlat[e] to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

Id. (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D. Ala. 1998)). The court finds that none of the evidence submitted by plaintiffs qualifies as direct evidence of discrimination or retaliation. None of the evidence offered proves without inference or presumption that the persons who made the employment decisions did so as a result of a discriminatory or retaliatory motive.

Plaintiff may attempt to show discrimination and retaliation based on circumstantial evidence through the application of the McDonnell Douglas burden-shifting analysis established by the Supreme Court. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, a plaintiff must first raise an inference of discrimination or retaliation by establishing a prima facie case. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997)). Assuming for the purposes of argument that plaintiffs could establish a prima facie case, the burden would then shift to the defendant, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action. The employer's burden is exceedingly light." Hamilton, 122 F.Supp.2d at 1280 (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotations omitted)). If the defendant proffers a legitimate reason for the employment decisions, the burden then shifts back to plaintiff, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. Id. "At the pretext stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." Miller v. Bed, Bath & Beyond, Inc., 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing Combs, 106 F.3d at 1538). Plaintiff may do this "(1) by showing that the employer's legitimate nondiscriminatory reasons should

28

not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." Id. (citations omitted). "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" Hamilton, 122 F. Supp.2d at 1281 (quoting Combs, 106 F.3d at 1539). However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." Chapman, 229 F.3d at 1030 (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). It is not appropriate for either the plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." Chapman, 229 F.3d at 1030. The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Plaintiffs claim Home Depot retaliated against them for making complaints about Cavaluzzi's harassment. To establish a prima facie case of retaliation based on circumstantial evidence, the plaintiff must show:

(1) []he engaged in statutorily protected expression; (2) []he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.

Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (citations omitted). Clearly filing a complaint alleging sexual harassment is a statutorily protected expression. Internal complaints about sexual harassment or racial discrimination are statutorily-protected activities. See Pipkins v. City of Temple Terrace, Fla, 267 F.3d 1197, 1201 (11th Cir. 2001). It is equally clear that plaintiffs suffered an adverse employment action when they were terminated.[4]

---

[4] The court notes that plaintiffs also appear to assert that they suffered adverse employment actions prior to being terminated in that Raya was told Cavaluzzi "had a hard on for him"; Leon McLaughlin walked the store more frequently and asked hourly associates about Corbitt, their store manager; and McLaughlin diverted sales from Corbitt's store to another store. (Plaintiffs' response: Doc. 92, pp. 18-19). However, "not everything that makes an employee

However, there is evidence that the decision makers in this case were not aware of the plaintiffs' harassment complaints at the time they decided to terminate plaintiffs.  The adverse action cannot be causally related to the protected expression if the decision makers were not aware of the protected expression. See Clover v. Total System Services, Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (holding that a plaintiff must "[a]t a minimum ... establish that the employer was actually aware of the protected expression at the time it took adverse employment action."). Plaintiffs allege that Cavaluzzi took some part in the decision to terminate the plaintiffs, but the court finds that the evidence does not support that contention.[5]  Temporal proximity is also not sufficient to show a causal connection where the plaintiff has not shown that the decision makers had knowledge of plaintiff's protected expression. Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("A plaintiff satisfies this element if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse ... action." (citation and internal quotations omitted)).  Thus, plaintiffs have not shown that any adverse action was causally related to the protected expression.

_____

unhappy is an actionable adverse action." Shannon v. BellSouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quoting Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001)).  To be actionable, the adverse action must be "likely to chill the exercise of constitutionally protected speech." Stavropoulos v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004).  The Supreme Court has characterized the anti-retaliation provision as protecting an individual not from all retaliation, but from retaliation that produces injury or harm. Burlington Northern  & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2414 (2006). The acts must be material and significant and not trivial. Id. 2405, 126 S.Ct. at 2415.  Plaintiffs have not offered any evidence that they were harmed by these alleged adverse actions.

[5]"neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge." McShane v. U.S. Attorney General, 144 Fed.Appx. 779, 790 (11th Cir. 2005) (quoting Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002)). Moreover, "mere coincidence in time [may not] raise an inference of actual knowledge where there is unrebutted evidence that the decision[-]maker did not have knowledge that the employee engaged in protected conduct. " Id. (quoting Brochu supra (internal quotations omitted))

Even if plaintiffs could establish a prima facie case, Home Depot has proffered legitimate reasons for terminating plaintiffs.  According to Home Depot, Corbitt and Raya were terminated for violating Home Depot's mark down policy and for using a company cell phone for their own private use.   There appears to be little dispute that Corbitt and Raya marked down prices for contractors, employees, and even competitors under circumstances that were at least questionable, if not actual violations of company policy.  While plaintiffs may assert that supervisors were aware of, or even approved of, some of the mark downs, it is clear that Home Depot had reason to believe that the plaintiffs had engaged in questionable conduct.  Moreover, an employer may terminate an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984).  Thus, the court finds that Home Depot has satisfied its burden of proffering a legitimate reason for terminating plaintiffs.

Plaintiffs attempt to show pretext by offering comparators who allegedly committed the same or similar mark down violations without being terminated.  Plaintiffs submit that 1) Store Manager, Tim Pardue, gave blanket ten percent discounts to contractors at the Foley Store; 2) Store Manager, Sandy Snyder, continued Pardue's practice of giving 10 percent discounts to contractors at the Foley store; 3) Assistant Store Manager, Dan Shulte, allowed the blanket discounts to contractors at the Foley store; 4) Store Manager, Donna Montgomery, replaced Corbitt at the Foley store and continued the blanket 10 percent discounts to contractors; 5) District Manager, Eric Dardas, approved blanket ten per cent discounts to contractors at the Foley store and approved discounted sales to competitor, Midway Forest Products; 6) Either Aaron Flow or Chris Mangino and either Sabrina Jones or Dan Shulte were the store managers of the Pensacola Store and allowed discounts to Adams Homes; 6) Store Manager, Rick Liska, gave blanket 10 percent discounts to contractors on all sales over $1,000 if made on Home Depot charge cards and used a Home Depot cell phone, 7) District Manager, Leon McLaughlin,

approved or allowed Liska to give 10 percent discounts to contractors and approved sales to a competitor, Midway Forest Products, 8) Store Manager, Aaron Flow, sold discounted truckloads of OSB sheets to competitor, Midway Forest Products, 9) Store Manager, Mike McGowan, approved sales to a competitor, Midway Forest Products, 10) Store Manager, Chris Mangino, marked down sales to a competitor, Midway Forest Products, and 11) Vicki Hall used a Home Depot cell phone.

To be appropriate comparators the employees must be "similarly situated in all aspects." Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997).  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citations omitted).   It is highly questionable whether Dan Shulte, Eric Dardas, or Leon McLaughlin could be considered similarly-situated since they were not at the same level position as plaintiffs. See Wehunt v. R.W. Page Corp.,  352 F.Supp.2d 1342, 1352, n 3 (M.D. Ga. 2004) (Employee working as plaintiff's subordinate "clearly had different job duties and cannot be considered similarly situated to Plaintiff."); Etienne v. Muvico Theaters, Inc., 2003 WL 21184268, *13 (S.D. Fla. 2003) ("Mr. Etienne's duties as senior manager - which included overseeing the activities of the other managers - differed and were separate from those of the other managers. To a significant extent, Mr. Etienne, by virtue of his position, was not "similarly situated" in certain respects to the other managers. As such, Mr. Elder could legitimately hold Mr. Etienne responsible for cash accounting problems occurring under his watch.").  There is also evidence that Donna Montgomery, the Store Manager at the Foley Store immediately following Corbitt, discontinued the practice of giving contractors blanket discounts when it was brought to her attention.  Moreover, for any of the employees to be a comparator, "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (citation and internal

quotations omitted).  Home Depot has asserted that Corbitt and Raya had the most egregious violations.  Plaintiffs have not alleged that any of the proffered comparators engaged in all of the violations in which plaintiffs allegedly engaged.

Plaintiffs point out that Home Depot's stated reasons for eliminating plaintiffs have varied somewhat among its depositions, written statements, and answers to interrogatories. However, in order to constitute evidence of pretext, the reasons submitted for terminating an employee must be fundamentally inconsistent in order to constitute evidence of pretext. See Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1458-59 (11th Cir. 1997).  The court does not find the reasons offered by Home Depot to be inconsistent.

The court also finds unavailing plaintiffs' contention that pretext is provided by Home Depot's failure to produce more evidence regarding when the investigation started or to have kept a better record of the investigation.  Plaintiffs have submitted no reliable evidence that the investigation was a sham or that it was only begun because plaintiffs complained about Cavaluzzi's conduct.


**D. State Law Claims (Count Three)**

Plaintiffs assert state law claims of  1) assault and battery, 2) outrage, 3) negligent and wanton hiring, retaining, training and supervision, and  4) invasion of privacy.  Home Depot asserts that it is not liable for the intentional torts of assault and battery, outrage and invasion of privacy.

> For an employer to be held liable for the intentional torts of its agent, the plaintiff must offer evidence (1) that the agent's wrongful acts were committed in the line and scope of the agent's employment; or (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts.

Machen v. Childersburg Bancorporation, Inc., 761 So.2d 981, 984 (Ala. 1999) (citation

omitted).[6]  The evidence does not demonstrate that Cavaluzzi's alleged acts of misconduct were

committed in the line and scope of his employment with Home Depot or that they were

committed in furtherance of Home Depot's business.  See Id. (citations omitted).  Instead, the

evidence indicates that Cavaluzzi's  alleged acts were personal in nature.  See Doe v. Swift, 570

So.2d 1209 (Ala. 1990).   Plaintiffs allege that Home Depot ratified the assaults, batteries,

invasions of privacy, and outrageous conducts by failing to stop the tortious conduct after

learning of the conduct.

> To prove that an employer has implicitly ratified or tolerated one employee's
> sexual harassment of another employee, ... in addition to proving the underlying
> tortious conduct of an offending employee, a complaining employee must show
> that the employer (1) had actual knowledge of the tortious conduct of the
> offending employee and that the tortious conduct was directed at and visited upon
> the complaining employee; (2) that based upon this knowledge, the employer
> knew, or should have known, that such conduct constituted sexual harassment
> and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps
> to remedy the situation.

Potts v. BE & K Construction Company, 604 So.2d 398, 400 (Ala. 1992).   Home Depot asserts

that it did not have actual knowledge of the alleged tortious acts.  To support its contention,

Home Depot cites Cartwright v. Tacala, Inc., 2000 WL 33287445 (M.D. Ala., Nov. 1, 2000).  In

Cartwright, the plaintiff did not follow the defendant's anti-harassment policy and instead

reported the alleged harassment only to the assistant manager, who was subordinate to the

employee that allegedly harassed the plaintiff and who had no supervisory authority over that

employee.  The Middle District of Alabama found that the plaintiff had not presented sufficient

evidence to demonstrate a genuine issue of material fact regarding whether the defendant had

actual knowledge of the sexually harassing conduct.  Id. at *18.  In the instant case, although

---

[6] Plaintiffs assert that some of the wrongful acts occurred in Florida.  Florida law
similarly holds that an employer is not liable for the intentional torts of its employee unless the
intentional acts are incidental to the agent's employment,  within the scope of the master's
business, or are authorized or ratified by the master.  See Columbia By the Sea, Inc. v. Petty, 157
So.2d 190, 192 (Fla. App. 1963).  Thus, to the extent Florida law applies, the analysis would be
the same.

plaintiffs allege they gave notice to the Store Human Resource Manager as instructed under Home Depot's ant-harassment policy, as this court discussed above in relation to Home Depot's Faragher defense, that notice was not proper.  Home Depot was not on proper notice of the harassment until they lodged complaints in November 2005.  Plaintiffs' Complaint asserts that the harassing conduct stopped after plaintiffs complained to Home Depot.  Thus, the court finds that Home Depot did not have actual knowledge of the alleged harassing conduct and, therefore, could not have ratified or authorized such conduct.

Home Depot also asserts that plaintiffs have presented insufficient evidence to satisfy their burdens with regard to their claims of outrage and invasion of privacy.  Home Depot asserts, and the court agrees, that the alleged conduct is insufficient to rise to the requisite level of extreme, outrageous, or intrusive conduct to support such claims.  Thus, these claims are also due to be dismissed on this basis.

As to plaintiffs' negligence claim, Home Depot asserts that it cannot be held liable because it did not have notice that Cavaluzzi was unfit.  Home Depot asserts that there is no evidence of any complaints of inappropriate behavior against Cavaluzzi prior to plaintiffs' allegations against him.  Plaintiffs counter that Home Depot knew about Cavaluzzi's conduct as early as April or June 2005, when plaintiffs had complained to Donna Calhoun of the alleged harassing conduct.  As discussed above, the court has found that Home Depot did not have proper notice or actual knowledge that Cavaluzzi was sexually harassing plaintiffs.  However, actual knowledge is not necessary for an employer to be liable for negligent supervision, training or hiring.  Plaintiffs may recover under this theory if they can show by affirmative proof that the alleged incompetence of the employee "was discoverable by the employer if it had exercised care and proper diligence." Mills v. Wex-Tex Industries, Inc., 991 F.Supp. 1370, 1388 (M.D. Ala. 1997) (quoting Ledbetter v. United Am. Ins. Co., 624 So.2d 1371, 1373 (Ala. 1993)). Plaintiffs can demonstrate that Home Depot should have known of Cavaluzzi's incompetency by showing that his specific acts of incompetency were "of such nature, character, and frequency

that the master, in the exercise of due care, must have had them brought to his notice." Big B, Inc. v. Cottingham, 634 So.2d 999, 1003 (Ala. 1993)(quoting Lane v. Central Bank of Alabama, N.A., 425 So.2d 1098, 1100 (Ala. 1983)).

> While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

Id. (citing Lane supra). Home Depot's Store Human Resource Manager and other employees were aware of at least a few incidents where Cavaluzzi engaged in questionable conduct and was aware that plaintiffs were uncomfortable because of some of Cavaluzzi's conduct. There is evidence that other managers and supervisors were also aware of some of Cavaluzzi's allegedly wrongful conduct. Assuming that Cavaluzzi's alleged conduct was wrongful[7] and that Home Depot could have prevented or corrected the wrongful conduct if it had not been negligent, it is possible that Home Depot would have become aware of Cavaluzzi's alleged unfitness or incompetence if it had investigated further. Thus, the court finds that there is sufficient evidence of knowledge that summary judgment should be denied as to this one claim on that basis.

---

[7] "A party alleging negligent or wanton supervision and hiring must also prove the underlying wrongful conduct of employees." Voyager Ins. Companies v. Whitson, 867 So.2d 1065, 1073 (Ala. 2003) (citation omitted). The court determined, above, that plaintiffs are unable to demonstrate that Cavaluzzi's conduct created a hostile environment or that Cavaluzzi participated in the decision to terminate plaintiffs. The court also determined that plaintiffs have not shown that Cavaluzzi's conduct supports a claim for outrage or invasion of privacy. The only claim remaining which has not been denied for failure of proof that the alleged conduct occurred is the claim of assault and battery. The court is granting summary judgment for defendants on the assault and battery claim only on the basis that Home Depot cannot be held liable because it did not have actual knowledge of the alleged wrongful conduct. Thus, the court finds that the only alleged wrongful conduct on which the plaintiffs may rely to support their contention that Cavaluzzi was unfit or incompetent is Cavaluzzi's alleged assault and battery of plaintiffs.

## **CONCLUSION**

For the reasons stated above, the motion of defendant, Home Depot USA, Inc., for summary judgment (Doc. 86) is **GRANTED IN PART** and **DENIED IN PART.**   The motion is  **GRANTED** in favor of defendant as to plaintiffs' claims of **hostile environment, retaliation, assault and battery, outrage, and invasion of privacy**; it is **DENIED** as to plaintiffs' **negligent supervision and training** claim.

**DONE** and **ORDERED** this 3rd day of March, 2008.

 /s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE